UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LINDA DEVOOGHT and
JENNIFER PIPER,

                Plaintiffs,

      vs.

CITY OF WARREN and WILLIAM
DWYER, in his Individual Capacity,

              Defendants.

_____/

Case No. 20-CV-13168

HON. GEORGE CARAM STEEH

OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [ECF NO. 28]

Plaintiffs Linda DeVooght and Jennifer Piper are dispatchers employed by defendant City of Warren (City). DeVooght and Piper were also plaintiffs in a previous lawsuit filed against the City of Warren, alleging violations of their Fourteenth Amendment Equal Protection rights and their rights under the Michigan Elliott Larsen Civil Rights Act ("ELCRA"), MCL 37.2201, *et seq*. *DeVooght et al. v. City of Warren*, 20-10812. In the present lawsuit, DeVooght and Piper allege that the City and its Police Commissioner, William Dwyer, undertook Internal Affairs (IA) investigations and authorized and implemented discipline against them in retaliation for exercising their statutory and constitutional rights to oppose unlawful employment discrimination and seek

- 1 -

redress in federal court. Plaintiffs allege retaliation for exercising their rights in violation of the First Amendment (Count I) and the ELCRA, M.C.L. § 37.2101 *et seq*. (Count II). The matter is before the Court on defendants' motion for summary judgment (ECF No. 28)[1]. Upon a careful review of the written submissions, the Court deems it appropriate to render its decision without a hearing pursuant to Local Rule 7.1(f)(2). For the reasons set forth below, defendant's motion for summary judgment is granted in part and denied in part.

<u>FACTUAL BACKGROUND</u>

On March 27, 2020, plaintiffs DeVooght and Piper, along with several other dispatchers, filed a gender discrimination lawsuit challenging the legality of the City's prisoner search policy. The plaintiffs alleged that the City's policy requiring female dispatchers, but never male dispatchers, to search female arrestees when a female officer is not available, violated their equal protection rights. Eleven days later, on April 8, 2020, defendants initiated an IA investigation into DeVooght, who at the time was the Dispatch Supervisor. Lt. Kriss, the officer who handled the investigation, testified it was based on two formal complaints.

The first complaint was brought by dispatcher Ryan Fessenden. Fessenden was concerned about his job and retirement benefits because he

---

[1] Defendants initially filed their motion for summary judgment on December 2, 2022 (ECF No. 27). A *corrected* version of defendants' motion for summary judgment was filed on December 5, 2022 (ECF No. 28).

believed that the female dispatchers' gender discrimination lawsuit might cause the City to outsource the dispatch department. Fessenden dep., pp. 44-45, ECF No. 32-4, PageID.1054. Fessenden went to Captain Bonett to discuss his concerns. Fessenden described himself as very emotional during the conversation, and that while he was talking to Bonett, he relayed that he had witnessed DeVooght ask dispatcher Chelsea Dranberg whether she was in or out of the gender discrimination lawsuit. According to Fessenden, Bonett focused on this information about DeVooght. *Id.* at pp. 75-77, ECF No. 32-4, PageID.1062. Bonett referred the information about DeVooght to Lt. Kriss, who ordered Fessenden and Dranberg to submit Form 50s. Fessenden wrote that he witnessed DeVooght approach Dranberg in the kitchen area of the dispatch center and overheard her ask Dranberg whether she was in or out of the lawsuit and if she was out that she would be removed from the message list. ECF No. 32-5, PageID.1080. Dranberg wrote in her Form 50 that "[o]ther dispatchers were able to hear the conversation and I felt very intimidated that this conversation was not private, and took place during work in front of other coworkers." ECF No. 28-2, PageID.196.

The second complaint originated on April 9, 2020, when DeVooght reported an incident to her supervisor, Lt. James Wolfe, involving a recurring tardiness issue with dispatcher Mariah Alasadi. DeVooght told Wolfe that Alasadi was tardy

for work that day, so she spoke to her about not calling in her tardies in advance. DeVooght later heard Alasadi use a profanity to refer to her in front of coworkers. DeVooght did not make a formal complaint but did ask Wolfe to counsel Alasadi. Wolfe approached Alasadi, who admitted being late, but said she believed DeVooght was picking on her because she did not agree with the gender discrimination lawsuit. Wolfe sent a report of his conversations with DeVooght and Alasadi to Cptn. Bonett. ECF No. 28-4, PageID.234.

Lieutenant Wolfe explained that personnel issues are generally managed through supervisors. There is a chain of command wherein if a Dispatch Supervisor wants to recommend discipline for a dispatcher, they are supposed to complete a form and give it to a sergeant. The complaint would then go to Captain Bonett and then to Commissioner Dwyer. If the complaint is ultimately sent to Internal Affairs, it is assigned a number. IA can take over the complaint or send it back to the original supervisor for further investigation. Depending on the seriousness of the circumstances, the supervisor could decide to do a Form 50 or conduct a full investigation with Garrity[2] interviews. The supervisor would conclude their investigation by reporting their findings in a Form 127 and send it to their supervisor for a recommendation of discipline. The Commissioner has the

---

[2] Garrity Rights protect public employees from being compelled to incriminate themselves during an investigative interview conducted by their employer.

ultimate authority to determine discipline. Wolfe dep., 25-28, ECF No. 32-8, PageID.1151-1152.

In this case, Commissioner Dwyer ordered that the information regarding both incidents be turned over to IA to open an investigation into DeVooght. Dwyer dep., p. 32, ECF No. 32-9, PageID.1177; ECF No. 32-2, PageID.970. Dwyer explained that other than Fessenden's discussion with Bonett, there was nothing that had come to their attention previously that warranted an IA investigation. Dwyer dep., p. 81, ECF No. 32-9, PageID.1189. On April 10, 2020, Lt. Kriss provided DeVooght with formal notice that he had opened an investigation against her for creating a hostile work environment. The investigation took two months, during which time Kriss reviewed records, reviewed text messages between the dispatchers and DeVooght concerning the gender discrimination suit, and conducted Garrity interviews of all 23 dispatchers. A union representative was present at each interview.

I.    DeVooght - Hostile Work Environment

In their Garrity interviews, several dispatchers reported complaints about a toxic environment in the dispatch center generally. Kriss believed the negative environment was due in large part, but not entirely, to the gender discrimination lawsuit. Kriss dep. p. 40, ECF No. 32-3, PageID.1016. Kriss specifically referred to dispatchers Alasadi, Abrams, Dranberg, Davidson and Angelucci, who stated

they were concerned that there would be some form of retaliation by DeVooght for not participating in the lawsuit, though they admitted they had not actually experienced retaliation. *Id*. at pp. 39-43, ECF No. 32-3, PageID.1016-1017. Kriss concluded that his investigation did not support Alasadi's allegation that DeVooght approaching Sgt. Wolfe about Alasadi's tardiness and profanity was retaliation for not participating in the gender discrimination lawsuit. *Id*. at pp. 39-40, ECF No. 32-3, PageID.1016.

Kriss ultimately determined that DeVooght did not actually retaliate against any of the dispatchers for not joining the gender discrimination lawsuit. However, he concluded that because DeVooght was a direct supervisor of all dispatchers, and that she forced subordinates to express a position for or against her position on the gender discrimination lawsuit, at work and in the dispatch center within earshot of other dispatchers, "DeVooght's actions created a hostile work environment for subordinates who were not participants in the lawsuit." Kriss also determined that "DeVooght presented as genuine when indicating that was never her intention and that she did not think at the time that her actions were improper though she agrees now that they were." ECF No. 32-2, PageID.1001; Kriss dep., p. 40, ECF No. 32-3, PageID.1016.

II.    DeVooght - Improper Access of Records

On April 23, 2020, as part of the IA investigation, Kriss interviewed dispatcher Amber Mavis. Mavis had been a plaintiff to the gender discrimination lawsuit, but voluntarily dismissed her claims on April 15, 2020. Kriss asked "whether she had witnessed any employees doing tasks associated with the lawsuit while on duty." IA Report, p. 14, ECF No. 32-2, PageID.982. Mavis responded that she had printed, signed and faxed documents to the attorneys for the dispatchers, and had accessed a Warren Police case report in the CLEMIS system related to a female prisoner who assaulted her during a search. *Id*. Upon learning that Mavis accessed the case report in CLEMIS, Kriss sought out the help from CMIS Specialist Crabtree and discovered that DeVooght also accessed the same case report. *Id*. Kriss then requested a list of all case reports viewed between January 1, 2020 and April 5, 2020 by the eight dispatchers who had, at least at some point, been plaintiffs in the gender discrimination lawsuit. *Id*. at ECF No. 32-2, PageID.983. Kriss did not make any such request regarding dispatchers who were never plaintiffs in that lawsuit.

The CLEMIS system contains data such as police reports and personal information. The dispatch department uses CLEMIS as their internal system to dispatch officers. Dispatchers receive training in how to use the system. Fessenden dep., p. 81-82, ECF No. 32-4, PageID.1063-1064. In contrast, the

Law Enforcement Information Network (LEIN) system is a state-wide computerized criminal justice database which contains information accessible to all criminal justice agencies. Dispatchers are trained on the legal requirements of using LEIN, which is strictly regulated. *Id*. at p. 82, ECF No. 32-4, PageID.1064. Several dispatchers testified that they accessed records in CLEMIS for personal reasons that were not strictly work-related, but never did so in LEIN. *See Id*. at 84-86, ECF No. 32-4, PageID.1064-1065; DeVooght dep. p. 122, ECF No. 32-6, PageID.1114. The dispatchers explained that "everyone" ran CLEMIS reports unrelated to work because they believed it was permissible. They based this belief on the fact that in training they were told "to get to know it, play around with it, run people you know." Piper dep., p. 65, ECF No. 28-19, PageID.683; DeVooght dep., p. 122, ECF No. 32-6, PageID.1114.

DeVooght admitted she accessed CLEMIS reports on prisoners for research related to the gender discrimination lawsuit. DeVooght testified that it was common knowledge in the department that CLEMIS records were not regulated in the same way LEIN was. DeVooght dep., p. 84, ECF No. 32-6, PageID.1104. DeVooght acknowledged that she forwarded one report to her lawyer that was not redacted and contained personal information of individuals including details of a strip search, she did not have permission or a legitimate work reason to access the reports, and she did not do a FOIA request for the

report. *Id*. at pp. 76-84. DeVooght also explained to Kriss that in her supervisory role she received a binder from retired dispatch supervisor Erin Leggett that included two LEIN documents among other internal department documents. She forwarded the binder to her attorney for use in the gender discrimination lawsuit without redactions because she was unaware that it included documents pulled from LEIN. DeVooght testified that she never misused the LEIN system by running a personal search, though she admitted that by sharing the binder that included LEIN documents, she violated General Orders 03-03, 09-04, and 02-01. ECF No. 32-2, PageID.1002.

III.    DeVooght – Charges, Discipline and Settlement

On July 31, 2020, DeVooght was issued Specification of Charges and Discipline that included violations of: (1) General Order 03-03 (Use of Department Information System), (2) General Order 09-04 (LEIN Usage), (3) General Order 02-01 (Personnel Conduct/Rules & Regulations), (4) 02-01 (Personnel Conduct/Rules & Regulations: Conduct Unbecoming of an Officer), and (5) 02-01 (Personnel Conduct/Rules & Regulations: Unsatisfactory Performance). ECF No. 32-17, PageID.1422. On August 3, 2020, a Loudermill hearing was held where DeVooght was represented by counsel for her Union (WPCOA). Following the hearing, Commissioner Dwyer sustained the charges against DeVooght and terminated her employment effective August 2, 2020.

The Union filed a Grievance on DeVooght's behalf, which was denied, but resulted in a negotiated resolution that included execution of a Settlement and Waiver. DeVooght was reinstated on October 7, 2020 but was demoted to dispatcher. DeVooght waived any right to file a grievance under the WPOA CBA based upon the agreement she previously reached and executed settling her grievance in the Command bargaining unit. ECF No. 28-10, PageID.360.

Due to DeVooght's demotion to dispatcher, she earned $8,826 less than she earned as supervisor. She had a 20-day disciplinary unpaid suspension, with no backpay for the time she did not work between August and October, remained ineligible for step-up capacities to earn extra pay as an interim supervisor or trainer, and was ineligible for promotion for 2 years. Grievance Settlement, ECF No. 32-21, PageID.1459. Despite her seniority, DeVooght was forced to return to the midnight shift. DeVooght dep., p. 147, ECF No. 32-6, PageID.1120.

IV.    Piper – Charges and Discipline

As part of the IA investigation into DeVooght, Piper admitted to conducting a search in CLEMIS for personal reasons. ECF No. 32-2, PageID.1002. On August 11, 2020, because of this information uncovered in the DeVooght investigation, Piper was issued a Notice of Charges and Specifications. ECF No. 28-11, PageID.362. Ultimately, Piper was issued a 3-day suspension, though she has not served the suspension because she has been on medical leave since

September of 2020 due to pneumonia secondary to COVID-19. While the parties dispute whether Piper has been medically cleared to return to work based on her IMEs, the City has not approved her return. On May 4, 2022, defendants changed Piper's employment status to retired. ECF No. 32-33, PageID.1722. In the summer of 2022, the union and the City agreed to send Piper to another IME, and she was examined in September; however, there is still no report from this physician.

In addition to being issued a 3-day unpaid suspension related to the CLEMIS searches, Piper also bases her retaliation claims on two separate IA charges brought against her in August of 2020. Complaint at ¶¶ 69, 72. The first of those charges involved a 2019 incident in which Piper allegedly activated a taser in the dispatch center. This incident was over 90 days old and the CBA prevents investigations or discipline on incidents not addressed within 90 days. ECF No. 32-26, PageID.1582. The second charge involved an allegation that Piper maliciously neglected her work responsibilities and willfully created a hostile work environment for her coworkers by holding runs and providing insufficient information to officers. Lt. Priest launched an investigation based on Form 50s he ordered the officers to complete. None of the Form 50s identified which dispatcher created the concern and two of the officers did not recall the incident at all. ECF No. 32-27, PageID.1594-1603. Both of these matters remain

open due to Piper's disability status. No final conclusions have been reached and

no discipline has been issued. The investigations will continue if Piper returns to

duty.

Piper has suffered extensive economic damages related to the City's

refusal to return her to work and she has experienced chest pain and other

severe complications from the stress of being terminated. Piper dep., pp. 124-

125, ECF No. 32-31, PageID.1707. Nevertheless, she remains interested in

returning to work. *Id.* at p. 149, ECF No. 32-31, PageID.1713.

## STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) empowers the court to render

summary judgment "forthwith if the pleadings, depositions, answers to

interrogatories and admissions on file, together with the affidavits, if any, show

that there is no genuine issue as to any material fact and that the moving party is

entitled to judgment as a matter of law."  *See Redding v. St. Eward*, 241 F.3d

530, 532 (6th Cir. 2001).  The Supreme Court has affirmed the court's use of

summary judgment as an integral part of the fair and efficient administration of

justice.  The procedure is not a disfavored procedural shortcut.  *Celotex Corp. v.

Catrett*, 477 U.S. 317, 327 (1986); *see also Cox v. Kentucky Dept. of Transp.*, 53

F.3d 146, 149 (6th Cir. 1995).

- 12 -

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Amway Distributors Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Tolan v.* Cotton, 572 U.S. 650, 660 (2014); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Redding*, 241 F.3d at 532 (6th Cir. 2001). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *see also National Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings

will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party.  *Anderson*, 477 U.S. at 248, 252.  Rather, there must be evidence on which a jury could reasonably find for the non-movant.  *McLean*, 224 F.3d at 800 (*citing Anderson*, 477 U.S. at 252).

<u>ANALYSIS</u>

To prove a claim of First Amendment retaliation, an employee must prove the following elements: (1) they engaged in constitutionally protected conduct, (2) an adverse action was taken that would deter a person of ordinary firmness from continuing to engage in that conduct, and (3) the adverse action was motivated in part by protected conduct. *Wurzelbacher v. Jones–Kelley,* 675 F.3d 580, 583 (6th Cir. 2012). If the employee establishes a prima facie case, the burden then shifts to the employer to demonstrate "by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct." *Eckerman v. Tenn. Dep't of Safety,* 636 F.3d 202, 208 (6th Cir. 2010).

Similarly, to establish a violation of the Elliot Larsen Civil Rights Act, "a plaintiff must show (1) that [s]he engaged in a protected activity; (2) that this was known by the defendant; (3) that the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action." *El-Khalil v. Oakwood Healthcare, Inc.*, 504 Mich. 152, 161 (2019).

I.      Protected Activity

Defendant does not dispute that by filing the gender discrimination lawsuit, plaintiffs engaged in protected activity for purposes of establishing a claim of unlawful retaliation under the First Amendment and the Michigan Civil Rights Act.

II.     Adverse Employment Action

Whether plaintiffs have presented sufficient evidence to raise a genuine issue of material fact that they suffered an adverse employment action is governed by *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). In that case, the Supreme Court held that for a challenged action to be considered actionable retaliation, it needs to be "materially adverse, which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id*. at 68 (citations omitted). The Supreme Court emphasized that context matters in evaluating the significance of a given act of retaliation. "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Id*. at 69. Therefore, the Court observed that "by focusing on the materiality of the challenged [retaliatory] action and the perspective of a reasonable person in the plaintiff's position, we believe this standard will screen out trivial conduct while effectively capturing those acts that

- 15 -

are likely to dissuade employees from complaining or assisting in complaints about discrimination. *Id*. at 70.

    A.    <u>DeVooght</u>

DeVooght was subjected to an IA disciplinary investigation that resulted in her termination. Defendants do not dispute that this amounts to a materially adverse employment action taken against DeVooght.

    B.    <u>Piper</u>

Defendants contend that no adverse employment action was taken against Piper because she has not been disciplined. The AI investigations remain open, with no conclusions having been reached and no discipline issued, because Piper has been off work due to a disability. In order for an act to rise to the level of an adverse employment action to support a claim of retaliation it must produce an injury or harm to the employee. <u>Wierengo v. Akal Sec., Inc.</u>, 580 F. App'x 364, 373 (6th Cir. 2014). In Wierengo, the Sixth Circuit found that a complaint made against the plaintiff by her coworkers did not rise to the level of an adverse employment action where the plaintiff did not allege that the complaint resulted in any sort of injury or harm to her professionally or personally. *Id*.

The fact that the IA investigations and the suspension have been put on hold while Piper is on leave does not mean they are not material. Unlike the complaints made against the plaintiff in Wierengo, Piper's allegations against the

City and Dwyer rise above the "petty slights or minor annoyances that often take place at work and that all employees experience"—the sort of conduct the Sixth Circuit and other courts have concluded does not constitute retaliation. *See*, Scharp v. Van Buren Pub. Sch., No. 219CV13287TGBDRG, 2022 WL 480238, at *11 (E.D. Mich. Feb. 16, 2022) (collecting cases).

Defendants also maintain that Piper is precluded from basing her retaliation claim on the 3-day suspension because she failed to include that discipline in her pre-suit charge to the EEOC. The Court does not have a copy of the EEOC charge, but finds that even without the suspension, opening two IA investigations is sufficient to rise to the level of material adverse actions. A reasonable jury could conclude that the actions taken against Piper are likely to dissuade employees from complaining or assisting in complaints about discrimination.

III. Causal Connection

"To establish a causal connection, a plaintiff must proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 596 (6th Cir. 2007) (quoting *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007)). "Although temporal proximity itself is insufficient to find a causal connection, a temporal connection coupled with other indicia of retaliatory conduct may be sufficient to support a finding of a causal connection." *Id*.

- 17 -

(quoting *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 737 (6th Cir. 2006)). Ultimately, the retaliatory motive must be a "but-for" cause, meaning that the adverse action would not have been taken absent a retaliatory motive. *Nieves v. Bartlett*, 139 S.Ct. 1715, 1722 (2019). There may be multiple "but-for" causes of the materially adverse action, and the protected activity must be *a* cause but need not be the *sole* case. *Burrage v U.S.,* 134 S. Ct. 881, 888 (2014). To make a prima facie case of retaliation under the ELCRA, Michigan evaluates causation under the "significant factor" test. *Barrett v. Kirtland Cmty. Coll.*, 245 Mich. App. 306, 315 (2001)).

    A.    DeVooght

In this case, there was testimony from various sources describing the environment in the dispatch center as toxic, well before the plaintiffs' gender discrimination lawsuit was filed. Yet, an IA investigation was not opened into any alleged misconduct among the dispatchers until after the lawsuit was filed. The asserted bases of the IA investigation into DeVooght were (1) Fessenden feared the City would close the dispatch center and he would lose his job, and in the process of discussing this with Bonett, Fessenden revealed DeVooght might be creating an uncomfortable environment for dispatchers who are not part of the lawsuit; and (2) DeVooght properly submitted a complaint about Alasadi's tardiness up the chain of command, and when Wolfe talked to Alasadi she

admitted to being tardy, but accused DeVooght of retaliation because of her opposition to the lawsuit.

The evidence supports the suggestion that Bonett and Wolfe were more interested in the allegations regarding a hostile work environment than they were in the original reasons that they were approached. Clearly, allegations of a hostile work environment are a valid reason to open an IA investigation. However, here there are some indicia that the filing of the gender discrimination lawsuit motivated the investigation. For example, the female dispatchers had been complaining about doing searches for years prior to filing their lawsuit, and it was known that there was a toxic environment in the dispatch center, yet no complaints had previously been referred to IA for an investigation. In addition, in conducting the IA investigation, Lt. Kriss selectively investigated improper use of the CLEMIS system only by the female dispatchers who were or had been named plaintiffs in the lawsuit. Considering this evidence, a reasonable jury could conclude that plaintiffs' discrimination lawsuit was a but-for cause of the materially adverse actions taken by defendants.

B.    Piper

Defendants opened an IA investigation into Piper based on a stale incident (involving a taser) and accusations about neglect of duty based on questionable substantiation. In addition, Lt. Kriss selectively investigated the improper use of

the CLEMIS system only by female dispatchers who were or had been named plaintiffs in the lawsuit. When questioned on the topic of allowing Piper to return to work once she is medically cleared, Dwyer testified that she is an outstanding dispatcher. Dwyer dep. p. 74, ECF No. 32-9, PageID.1188. The Court finds that a reasonable jury could conclude that plaintiffs' discrimination lawsuit was a but-for cause of the materially adverse actions taken by defendants against Piper.

IV.   Pretext

Plaintiffs can establish causation and pretext by showing that the "defendant's disciplinary actions against [them] were unusual … unprecedented … and certainly not something that should have provoked the response it did." *Shaw v. Ecorse*, 283 Mich. App. 1, 16 (2009). Dredging up old issues is evidence of pretext, even when there is a history of performance problems. See, e.g., *Arban v. West Publishing Corp*., 345 F.3d 390, 401-402 (6th Cir. 2003); see also, *Cruz v. McAleenan*, 931 F.3d 1186, 1192, n.1 (D.C. Cir. 2019) (stating that an investigation is pretextual where the evidence suggests the "investigation was merely a post hoc effort to shore up [the employer's] decision to discipline [plaintiff.]"). Here, based on the timing, substance and circumstances of defendants' actions, plaintiffs have created a genuine issue as to whether their asserted reasons for investigating and disciplining plaintiffs was pretext for retaliation.

V.    Settlement and Release

Following DeVooght's termination, the union filed a grievance on her

behalf, arguing that DeVooght was terminated in violation of the CBA. The matter

was resolved by way of a negotiated resolution. The parties entered into a written

Settlement Agreement and Waiver whereby DeVooght was reinstated to a

dispatcher position. The Settlement Agreement provides that DeVooght releases

any claims she made or could have made for violation of any term of the CBA.

Settlement Agreement at ¶ 5, ECF No. 28-9, PageID.357. The claims in this

lawsuit involve the allegation that the IA investigation and resulting discipline

imposed were retaliation for DeVooght bringing her gender discrimination lawsuit,

in violation of the First Amendment and Michigan statute. Defendants have not

demonstrated that the claims in this civil lawsuit arise out of a violation of the

CBA such that they come within the scope of the release. For this reason,

defendants do not prevail on this argument.

VI.   Commissioner Dwyer

Plaintiffs assert their claims against defendant Dwyer in his individual

capacity as a final decisionmaker for the City.  A plaintiff raising a municipal

liability claim under §1983 must demonstrate that the alleged federal violation

occurred because of a municipal policy or custom. *Monell v. Dep't of Soc. Servs.,*

436 U.S. 658, 694 (1978). A plaintiff can make a showing of an illegal policy or

custom by demonstrating one of the following: (1) the existence of an illegal

official policy or legislative enactment; (2) that an official with final decision-

making authority ratified illegal actions; (3) the existence of a policy of inadequate

training or supervision; or (4) the existence of a custom of tolerance or

acquiescence of federal rights violations. *Burgess v. Fischer*, 735 F.3d 462, 478

(6th Cir. 2013) (citing *Thomas v. City of Chattanooga,* 398 F.3d 426, 429 (6th Cir.

2005)). A *Monell* theory may be stated based on a single act by a policy-maker.

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986). The limitation to this

rule is that it applies only to policymakers with final authority: "municipal liability

under § 1983 attaches where—and only where—a deliberate choice to follow a

course of action is made from among various alternatives by the official or

officials responsible for establishing final policy with respect to the subject matter

in question." *Id*.

Based on his own testimony, plaintiffs contend that Dwyer is the highest

authority in the WPD and is the "sole decision maker" for the WPD, holding the

sole authority to author WPD policies and general orders, impose discipline,

terminate employment, and initiate or end an IA investigation. Dwyer dep., pp. 7,

58. Dwyer further testified that he alone was responsible for ordering the IA

investigation in April of 2020 and for terminating Linda DeVooght: no one else

even suggested this discipline to him. *Id*. at pp. 57-58. However, Commissioner Dwyer's authority is subject to the Warren City Charter, which provides him with authority to manage the day-to-day activities of the WPD, but expressly reserves final authority over all decisions to the City's Mayor. Warren City Charter, §§ 7.9, 7.13, 7.17. Therefore, plaintiffs may not pursue their First Amendment retaliation claim against Dwyer.

Defendants also argue that claims under ELCRA may only be brought against the plaintiffs' employer – the City of Warren – not against an individual. However, MCL 37.2701(a) provides that a "person" shall not retaliate against a person for filing a complaint alleging a violation of ELCRA. Therefore, individuals can be named as defendants to retaliation claims under ELCRA. See *Garcia v. Beaumont Health*, No. CV 19-11673, 2020 WL 1074635, at *4 (E.D. Mich. Mar. 6, 2020) ("Clearly the actual harasser also can be liable for retaliation if his or her actions were in response to the plaintiff's opposition to a violation of the ELCRA."). As such, plaintiffs' retaliation claim under ELCRA can proceed against Dwyer individually.

<u>CONCLUSION</u>

For the reasons stated above, defendants' motion for summary judgment is GRANTED IN PART AND DENIED IN PART. Now, therefore,

- 23 -

IT IS HEREBY ORDERED that defendants' motion for summary judgment (ECF No. 28) is GRANTED as to the First Amendment retaliation claim asserted in Count I against defendant Commissioner Dwyer and DENIED in all other respects.

So ordered.

Dated:  March 24, 2023

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on March 24, 2023, by electronic and/or ordinary mail.

s/Michael Lang
Deputy Clerk

---